## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GABRIEL RIVERA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 23-CV-4217 |
| | : | |
| PAUL LITTLE, *et al.*, | : | |
| Defendants. | : | |

### MEMORANDUM

SCOTT, J.                                                          JULY  22, 2024

Currently before the Court are the Defendants Motions to Dismiss Plaintiff Gabriel

Rivera's Amended Complaint, in which Rivera, a convicted and sentenced prisoner currently

incarcerated at SCI Chester, sued employees of SCI Chester and employees of Wellpath, the

prison's medical contractor.  (ECF No. 14 ("Am. Compl.").)  Rivera primarily raises

constitutional claims pursuant to 42 U.S.C. § 1983, and related medical malpractice claims under

state law, based on what he contends was delayed and inadequate medical treatment in response

to his declining medical condition culminating in a heart attack.  For the following reasons, the

Court will grant the Defendants Motions in part, but will deny them to the extent they seek

dismissal of Rivera's Eighth Amendment claims for deliberate indifference to his serious

medical needs, because Rivera has pled a plausible claim.

### I.      FACTUAL ALLEGATIONS[1]

---

[1] The following factual allegations are taken from the Amended Complaint, which is the
governing pleading in this case.  *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019).
Since "the most recently filed amended complaint becomes the operative pleading," *id*., the
Court does not consider the initial Complaint or any other documents in determining whether
Rivera has stated a plausible claim.  *Argentina v. Gillette*, 778 F. App'x 173, 175 n.3 (3d Cir.
2019) (*per curiam*) ("[L]iberal construction of a *pro se* amended complaint does not mean
accumulating allegations from superseded pleadings.").  The Court adopts the pagination
supplied by the CM/ECF docketing system.

Rivera filed his Amended Complaint against two groups of Defendants in their individual and official capacities:  (1) Defendants employed or previously employed by Wellpath, specifically, Dr. Paul Little, L.P.N. Shareeta Davis, R.N. Tiana Hardy, and P.A. Nicholson (the "Medical Defendants"); and (2) Defendants employed by SCI Chester, specifically, George Arias (a correctional officer) and S. Reeder (a security captain) (the "DOC" Defendants).  (Am. Compl. 2-5.)  He alleges that the events giving rise to his claims took place between May 22, 2023 and May 27, 2023, and on June 16, 2023 on his housing unit, the medical department and in the restricted housing unit.  (*Id.* at 6, 9.)  The Court understands the gist of Rivera's allegations to be that he suffers from hypertension and other unspecified health issues that worsened in May 2023, culminating in symptoms of what was, or what Rivera believed to be, a heart attack, and that the Defendants failed to provide proper timely treatment despite his requests and, instead, punished him for seeking treatment.

Rivera alleges that on May 22, 2023, he went to the medical department to have his blood pressure checked because he "was not feeling normal." (*Id.* at 11.)  He alleges that the nurse refused to check his blood pressure and told him to "submit a sick call," which he did.  (*Id.*)  Rivera saw Defendant Dr. Little the next day and told the doctor that he was "having the same health issues as before, nothing has gotten better everything is getting worse." (*Id.*)  Dr. Little allegedly told Rivera that there was nothing he could do for him, stating, "I told you before you have a life expectancy of 10 to 20 years if you don't get your blood pressure under control." (*Id.*)  Rivera allegedly responded that he had been seeking help from the medical department for the prior two years but never received a diagnosis or treatment for his "health issues."[2]  (*Id.*)  Dr.

_____

[2] In his Response, Rivera clarifies that he suffers from hypertension, athlete heart and enlarged heart.  (ECF No. 33 at 14.)

Little then "prescribe[d] some medication to see if it [could] help [Rivera] with [his] blood pressure" and ordered blood work.  (*Id.*)  Rivera was not called to the medical department the next day for blood work, so he submitted another sick call slip on May 25 because he was "still dealing with the same symptoms."  (*Id.* at 12.)

On May 26, 2023, between 8:00 a.m. and 10:00 a.m., Rivera asked non-defendant Correctional Officer Jones to call the medical department because Rivera was experiencing the same "heath issues" for which he had submitted a sick call slip the previous day.  (*Id.* at 10.) After contacting the medical department, Officer Jones informed Rivera that "medical staff" advised him to "submit another sick-call slip because [his] case is not severe."  (*Id.*)  At 10:00 a.m., Officer Jones asked Rivera to "come down to the desk" to speak with medical personnel and a deputy who were present on the unit.  (*Id.*)  Rivera and Jones explained "what [they] just experience[d] and [Rivera's] state of health" and were advised that the deputy and medical personnel would speak to the Doctor and call for Rivera "to go to medical to be evaluated."  (*Id.*)

Rivera was called to the medical department at approximately 11:00 a.m. and was seen by Defendant P.A. Nicholson.  (*Id.*)  Rivera alleges that Nicholson told him:

> If [he] continue[s] to complain that [he] would be placed in the "RHU"
> (Restricted Housing Unit) and that there is nothing he can do for [Rivera], for
> [Rivera] to just wait until they draw blood for labs (labs were never taken).

(*Id.*)  Rivera alleges he was denied medical services at that time and sent back to his unit.  (*Id.*)

At 1:24 a.m. the next morning (May 27), Rivera pressed the button on the intercom in his cell to get the attention of Defendant Officer Arias, who allegedly did not respond because the intercom was "inoperable."  (*Id.*)  When Officer Arias conducted rounds on the unit, Rivera informed Arias that his "chest was tight and [he] did not feel good" and that he "was experiencing the same symptoms from earlier in the day."  (*Id.*)  Rivera asked Arias to contact

the medical department to let them know his condition was worsening, but Arias allegedly ignored this request and made "false reports" that Rivera claims prevented him from receiving medical attention.[3]  (*Id.* at 10-11.)

Defendants LPN Davis and RN Hardy came to Rivera's cell at some point between the hours of 1:00 a.m. and 4:00 a.m.  (*Id.* at 11.)  Rivera described "the same symptoms [he] was experiencing from earlier in the day that are ongoing and getting worse."  (*Id.*)  Davis ordered Rivera to step out of the cell and sit on the floor, at which point Rivera heard Hardy say "he is having a heart attack."  (*Id.*)  Davis then injected him with Narcan.  (*Id.*)  Rivera alleges that he was then "placed in a wheelchair and everything went black."  (*Id.*)

Rivera claims that at some point between the hours of 2:00 a.m. and 10:00 a.m., he was placed in the RHU at the direction of Defendant Captain Reeder.  (*Id.*)  Rivera alleges that he was "still going in and out of consciousness" but did not receive medical attention and could not get anyone to help him.  (*Id.*)  Rivera was in the RHU for seven days;[4] he alleges he did not see a doctor during that time.  (*Id.*)

On June 16, 2023, Arias questioned Rivera about a grievance Rivera had submitted against him.  (*Id.* at 13.)  Rivera alleges that Arias's "approach was very intimidating" and claims that Arias "harassed [him]" and tried to "intimidate" him because of grievances he filed against Arias.  (*Id.*)

_____

[3] In his Response to the Medical Defendants' Motion to Dismiss, Rivera clarifies this allegation, indicating that Officer Arias's "false report" was that Rivera was "on drugs."  (ECF No. 33 at 5.)

[4] In his Response, Rivera says he was placed in the RHU for six days.  (ECF No. 33 at 5.) Exhibits to Rivera's Response indicate that he was placed in the RHU by Defendant Reeder because he was under investigation for a potential violation of facility rules, although the nature of that alleged violation is unclear, and that he was released when the investigation concluded. (*Id.* at 11, 13.)

Based on those allegations, Rivera brings Eighth Amendment claims against all of the Defendants for deliberate indifference to his serious medical needs, as well as state claims for medical malpractice against the Medical Defendants.[5]  (*Id.* at 5.)  Rivera describes his claims as follows:

> I have been seeking medical attention . . . for almost 2 years and no treatment was ever provided for my condition.  Dr. Paul Little knew the risk of serious harm and disregarded the risk by failing to take reasonable measures to abate it, Dr. Paul Little had knowledge and fail[ed] to act despite such knowledge.  LPN Shareeta Davis and RN Tiana Hardy fail[ed] to attend my medical needs the night of the medical emergency.  Captain Reeder and . . . Arias blocked access to a medical professional when they placed me in the RHU instead of the hospital, Officer Arias denied, delay[ed] and obstructed with medical treatment when he lied and falsified documents about what I told him the night I needed medical attention.

(*Id.* at 12.)  The Court also understands Rivera to be asserting a First Amendment retaliation claim against Arias based on the events of June 16.  (*Id.* at 6, 13.)

Rivera alleges that, as a result of the Defendants' conduct, he suffered injuries in the form of "shortness of breath, difficulty walking up steps, lower back pain, [loss] of memory, [loss] of feeling in hands [and] toes, migraines, difficulty speaking [and] depression."  (*Id.* at 9.)  He seeks damages and an injunction directing "safer conditions," a "review of the medical practices at the

---

[5] Although Rivera uses the phrase "Equal Protection" in his Amended Complaint, (Am. Compl. at 5), none of his allegations support any type of equal protection claim.  Accordingly, the Court does not consider an equal protection claim to be part of this lawsuit.  Further, to the extent Rivera intended to bring due process claims based on his placement in the RHU for seven days, his allegations do not establish that he suffered an atypical or significant hardship that would amount to a constitutional violation in this context.  *See Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) ("[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." (quoting *Sandin v. Conner*, 515 U.S. 472, 486 (1995)); *Griffin v. Vaughn*, 112 F.3d 706, 708 (3d Cir. 1997) (holding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed [. . .] by a court of law" and does not constitute a due process violation (quotation omitted)).  Nor is there any other basis for a claim under the Fourteenth Amendment.

prison," "better training for staff," and provision of "life alert buttons to inmates for emergency." (*Id.*)

After being served, the Defendants filed motions to dismiss the claims against them. The Medical Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis that Rivera failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA") and because Rivera failed to state plausible constitutional claims.[6] (ECF No. 21.) The DOC Defendants move pursuant to Federal Rules of Civil Procedure 12(b)(1) to dismiss Rivera's claims for injunctive relief for lack of standing, and to dismiss the official capacity and state law claims against them on immunity grounds. (ECF No. 41.) They also move to dismiss Rivera's remaining constitutional claims pursuant to Rule 12(b)(6). (*Id.*) Rivera responded to both motions, arguing that he exhausted required remedies and that he stated a sufficient factual basis to proceed on his claims. (ECF Nos. 33, 43.) The Medical Defendants filed a reply, to which Rivera responded. (ECF No. 36 & 40.) The Court will address the parties' arguments below.

## II.    STANDARDS OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

---

[6] The Medical Defendants did not address the state law claims brought against them.

*Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555.)

"Although the plausibility standard does not impose a probability requirement, it does require a

pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly*

*v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations

omitted).

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits

attached to the complaint, matters of public record, as well as undisputedly authentic documents

if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223,

230 (3d Cir. 2010).  To determine whether a complaint filed by a *pro* se litigant states a claim, a

court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff,

and "ask only whether that complaint, liberally construed contains facts sufficient to state a

plausible . . . claim."  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up); *see*

*also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally).

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject

Fed. R. Civ. P. 12(b)(1).  "A challenge to subject matter jurisdiction under Rule 12(b)(1) may be

either a facial or a factual attack."  *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).  A

facial attack does not dispute the facts alleged in the complaint, *id.*, and therefore essentially

applies the same standard as a motion under Rule 12(b)(6).  *See Const. Party of Pa. v. Aichele*,

757 F.3d 347, 358 (3d Cir. 2014) ("[A] facial attack calls for a district court to apply the same

standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*,

construing the alleged facts in favor of the nonmoving party.").  The court must therefore "only

consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Id.* (internal quotations omitted).

"A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). A plaintiff "bears the burden of showing that he has standing for each type of relief sought," including injunctive relief. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). "When, as in this case, prospective relief is sought, the plaintiff must show that he is 'likely to suffer future injury' from the defendant's conduct." *McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (quoting *Lyons*, 461 U.S. at 105).

Additionally, since Rivera is proceeding *in forma pauperis*, the Court may independently screen his Amended Complaint and dismiss it "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). The standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999). This provision provides the Court with an independent basis for assessing the plausibility of Rivera's claims, including by addressing issues that the parties have not raised. Furthermore, the Court may, on its own, dismiss any claims over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Grp. Against Smog and Pollution, Inc. v. Shenango, Inc.*, 810 F.3d

116, 122 n.6 (3d Cir. 2016) (explaining that "an objection to subject matter jurisdiction may be raised at any time [and] a court may raise jurisdictional issues *sua sponte*").

### III.   DISCUSSION

#### A.  PLRA Exhaustion

The Medical Defendants argue that Rivera failed to exhaust his administrative remedies prior to filing this lawsuit, as required by the PLRA, in accordance with the DOC's grievance policy, DC-ADM 804.[7]  (ECF No. 21 at 10.)  In that regard, they allege that Rivera only exhausted one grievance pertaining to the events of May 2023, and that grievance was filed against Defendant Arias, not any of the Medical Defendants.  (*Id.* at 11.)  Although Rivera filed other grievances pertaining to the events at issue, the Medical Defendants contend that these additional grievances either were not fully exhausted and/or did not name the Medical Defendants, such that they were not sufficient to exhaust any claims against them.  (*Id.*)  Rivera responds that he fully exhausted administrative remedies because he substantially complied with the relevant grievance procedures and notes that he mentioned Dr. Little and Nicholson in the grievance he filed against Arias, which was exhausted.  (ECF No. 33 at 14.)

The PLRA "mandates that prisoners exhaust internal prison grievance procedures before filing suit."  *Small v. Camden Cnty.*, 728 F.3d 265, 268 (3d Cir. 2013); *see* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  "Exhaustion is . . . a non-

---

[7] The Medical Defendants submitted a copy of DC-ADM 804 as an exhibit to their Motion. (ECF No. 21-3 at 3-37.)  It is also available online.  DC-ADM 804, *Inmate Grievance System*, *available at* https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf  (effective May 1, 2015; last viewed July 19, 2024).

jurisdictional prerequisite to an inmate bringing suit and, for that reason, . . . it constitutes a threshold issue that *courts* must address to determine whether litigation is being conducted in the right forum at the right time." *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (internal quotations omitted).  Accordingly, in cases governed by the PLRA, courts must address whether the prisoner-plaintiff has substantially complied with the prison's specific grievance procedures and determine whether those procedures were available to the inmate.  *Id.*  "Failure to exhaust is an affirmative defense that the defendant must plead and prove." *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Prater v. Dep't of Corr.*, 76 F.4th 184, 203 (3d Cir. 2023) (courts "determine whether a prisoner has properly exhausted a claim by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances" (internal quotations omitted)).  The DOC's grievance policy, DC-ADM 804, sets forth a three-step process for review of inmate grievances.  An inmate must initially submit a written grievance to the Facility Grievance Coordinator or his designee within fifteen working days after the event upon which the grievance is based.  DC-ADM 804, § 1.A(5), (8).  The grievance must state the date, approximate time and location of the events giving rise to the grievance, must identify individuals directly involved in the events, and shall state any claims the inmate wishes to make based on those events.  *Id.*, § 1.A(11).  If the grievance is rejected, the inmate has fifteen working days to appeal to the Facility Manager.  *Id.*, § 2.A.  If the Facility Manager rejects the appeal, the inmate may appeal for Final Review with the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days of the denial of the Facility Manager's appeal.  *Id.*, § 2.B.

However, "a prisoner dealing with an emergency, or an urgent situation, is not bound by the ordinary procedures specified in the grievance policy.  Instead, he or she only needs to alert the closest staff person."  *Downey*, 968 F.3d at 306; *see also* DC-ADM 804, § 1.A.2 (explaining that the grievance system "is not meant to address incidents of an urgent or emergency nature" and that "[w]hen faced with an incident of an urgent or emergency nature, the inmate shall contact the nearest staff member for immediate assistance").  "An emergency is a sudden and serious event that calls for immediate action and an urgent need for relief or help," and includes "rapidly deteriorating" medical situations requiring treatment.  *Downey*, 968 F.3d at 306-07 (internal quotations and alterations omitted).  In such a situation, "a plaintiff is excused from satisfying ADM 804's exhaustion requirement."  *Prater*, 76 F.4th at 204.

Liberally construing the Amended Complaint and taking all inferences in Rivera's favor, Rivera, who had a history of issues with his blood pressure, began experiencing symptoms on May 22, 2023, including tightness of the chest, that did not improve or worsened over the next few days, culminating in an emergent event on May 27, 2023 that he describes as a heart attack.[8] The Amended Complaint describes Rivera's numerous attempts to seek medical care by filing sick call slips and alerting officers on the unit to his symptoms.

Although the parties dispute the specific nature of the medical event Rivera experienced on May 27,[9] construing the Amended Complaint and taking all reasonable inferences in Rivera's favor, he describes a deteriorating medical situation that culminated in an emergency event

---

[8] The Response further clarifies that on the dates in question in May 2023, Rivera had been complaining of tightness in his chest, tightness in his arm, and trouble breathing.  (ECF No. 33 at 2, 5.)

[9] The Medical Defendants dispute that Rivera suffered from a heart attack on that date.  (ECF No. 21 at 9-10; ECF No. 36 at 1.)  At this stage of the litigation, however, Rivera's factual allegations must be taken as true.

during which he blacked out.  Despite these allegations, the parties do not address the threshold issue of DC-ADM 804's applicability.  Rather, they assume it applies.  But that is not necessarily so in light of binding case law from the United States Court of Appeals for the Third Circuit construing the DOC's grievance policy in the context of an urgent medical situation.  *See Downey*, 968 F.3d at 305-08 (inmate was not required to exhaust claims based on denial of medical care for urgent medical situation, *i.e.*, his urgent need for surgery to treat his glaucoma to save his eyesight).  Accordingly, the Court will not dismiss any claims based on exhaustion at this time because it is not apparent as a matter of law that Rivera was required to follow DC-ADM 804's three-step procedure based on conduct related to his deteriorating medical condition between May 22, 2023, and May 27, 2023.

### B.  Claims for Injunctive Relief

The DOC Defendants move to dismiss Rivera's claims for injunctive relief because he does not raise an ongoing violation of his rights.  (ECF No. 41 at 8.)  The Court agrees that Rivera has not alleged a basis for seeking injunctive relief because his claims are entirely predicated on past harm, *i.e.*, the manner in which the Defendants responded to his need for medical care in May 2023, more than a year ago.  *See Lyons*, 461 U.S. at 105 (standing to pursue injunctive relief depends on whether plaintiff is "likely to suffer future injury"); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) ("Allegations of possible future injury are not sufficient to satisfy Article III." (internal quotations omitted)); *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997) ("To show irreparable harm, the party seeking injunctive relief must at least demonstrate that there exists some cognizable danger of recurrent violation of its legal rights."

(internal quotations omitted)).  Accordingly, the Court will dismiss Rivera's claims for injunctive relief for lack of standing and will address his remaining claims for damages below.[10]

### C.  Official Capacity Claims for Damages Against the DOC Defendants

The DOC Defendants move to dismiss Rivera's damages claims against them in their official capacity as barred by the Eleventh Amendment.  (ECF No. 41 at 5-8.)  They also argue that the official capacity claims for damages are barred because state employees in their official capacities are not "persons" subject to liability under § 1983.  (*Id.* at 8.)  Rivera notes that he is also suing the Defendants in their individual capacities, and that those claims would not be precluded by principles of immunity.  (ECF No. 43 at 5.)

Official capacity claims are indistinguishable from claims against the governmental entity that employs the Defendants.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)).  Thus, § 1983 claims against the DOC Defendants in their official capacity are really claims against the Commonwealth, which is shielded from such claims by Eleventh Amendment immunity and, in any event, is not considered a "person" subject to liability under § 1983.  *See Downey*, 968 F.3d at 309-10 ("Eleventh Amendment immunity bars actions for retroactive relief against state officers acting in their official capacity."); *Lavia v. Pa., Dep't of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (explaining that, "[b]ecause the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, it shares in the Commonwealth's Eleventh Amendment immunity" and is also

---

[10] Although the Medical Defendants did not specifically move for the dismissal of Rivera's claims for injunctive relief, the same logic precludes those claims, so the Court will dismiss them as well.

not considered a person for purposes of § 1983).  Accordingly, the Court will dismiss Rivera's damages claims to the extent they are brought against the DOC Defendants in their official capacities.

### D.  State Law Claims Against the DOC Defendants

The DOC Defendants move for dismissal of the state law claims against them on sovereign immunity grounds.  (ECF No. 41 at 10.)  Pennsylvania law provides agencies, officials and employees of the Commonwealth acting within the scope of their duties with sovereign immunity from damages claims subject to exceptions not applicable here.  *See* 1 Pa. Cons. Stat. § 2310 (establishing immunity for Commonwealth officials and employees); 42 Pa. Cons. Stat. § 8521 (limiting waiver of immunity to specific exceptions); *id.* § 8522 (setting forth limited exceptions); *see also Stackhouse v. Pa. State Police*, 892 A.2d 54, 58 (Pa. Commw. Ct. 2006) ("Generally, the Commonwealth and its agencies, officials and employees acting within the scope of their duties are immune from suits for damages.").  Further, "a state officer is shielded from liability for intentional torts committed while acting within the scope of his duties."  *Bracey v. Betancourt*, No. 20-6205, 2021 WL 5112246, at *7 (E.D. Pa. Nov. 3, 2021); *see also Poteat v. Lydon*, No. 22-2114, 2023 WL 6620368, at *3 (3d Cir. Oct. 11, 2023) (*per curiam*) ("State sovereign immunity bars these suits against the Commonwealth and its employees acting within the scope of their duties, as the PSP employees were, and the limited negligence exceptions to sovereign immunity do not apply as Poteat alleged only intentional torts.").

Rivera argues that sovereign immunity does not apply here because the DOC Defendants "did not act within their scope of duties."[11]  (ECF No. 43 at 5.)  "Pennsylvania has accepted the

---

[11] Rivera also mentions the Americans with Disabilities Act ("ADA"), (ECF No. 43 at 5), but the reason for this portion of his response is unclear because he does not assert an ADA claim in the Amended Complaint.  In any event, failure to treat a medical condition — the crux of Rivera's

Restatement (Second) of Agency's definition of conduct 'within the scope of employment.'" *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000) (quoting *Butler v. Flo-Ron Vending Co.*, 557 A.2d 730 (Pa. Super. Ct. 1989)).  "According to the Restatement, 'conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master . . . .'"  *Id.* (quoting Restatement (Second) Agency § 228) (alterations in original).  "Under Pennsylvania law, even unauthorized acts may be within the scope of employment 'if they are clearly incidental to the master's business.'"  *Id.* at 381 (quoting *Shuman Estate v. Weber*, 216 A.2d 169 (Pa. Super. Ct. 1980)).

The allegations of the Amended Complaint reflect that Reeder and Arias were acting as DOC employees when they placed Rivera in the RHU and responded to his medical concerns in the manner in which they did.  They were working at a DOC facility at the time and performing tasks that Correctional Officers would be expected to perform for the purpose of serving their employer while on shift.  Even if Reeder and Arias responded inappropriately to Rivera's medical concerns, which is the gist of Rivera's claims against them, that would not equate to a conclusion that they did not act within the scope of their employment.  *See, e.g.*, *Hill v. Barnacle*, 655 F. App'x 142, 148 (3d Cir. 2016) (*per curiam*) (agreeing "that defendants' only alleged actions — suspending Hill's visitation and mail privileges and confiscating her mail — were

---

claims in this case — does not give rise to an ADA claim, so there is no apparent basis for such a claim here.  *See Kokinda v. Pa. Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016) (*per curiam*) ("The District Court was also correct to conclude . . . that Kokinda's ADA claims fail because the ADA prohibits disability-based discrimination, not inadequate treatment for the disability." (footnotes and internal quotations omitted)); *Nunez v. Prime Care Health, Inc.*, No. 19-0859, 2019 WL 1400464, at *1 n.3 (E.D. Pa. Mar. 27, 2019) (explaining that "decisions about a prisoner's medical treatment generally do not give rise to a claim under the ADA" and citing cases).

necessarily committed in the scope of their employment by the prison and are not among the types of conduct as to which the Commonwealth has waived sovereign immunity"); *Feliz v. Kintock Grp.*, 297 F. App'x 131, 137 (3d Cir. 2008) (*per curiam*) ("While Feliz may take issue with the manner in which they performed their duties, there can be no question that the Commonwealth defendants were acting within the scope of their employment in the instant case."). Accordingly, the Court will dismiss any state law claims for damages against the DOC Defendants as barred by sovereign immunity.

### E. Deliberate Indifference to Medical Needs

The Medical Defendants and DOC Defendants both move to dismiss Rivera's Eighth Amendment claims for deliberate indifference to medical needs, arguing that he has failed to state a claim for various reasons.[12] To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring

---

[12] The Medical Defendants also argue that Rivera's claims are barred by the two-year statute of limitations. (ECF No. 21 at 14-15.) This argument is based on Rivera's description in the Amended Complaint of a conversation he had with Dr. Little on May 23, 2023, during which Rivera told the doctor "that I been contacting the medical department and seeking help for the last 2 years to help me figure out what is wrong with me and I never receive any treatment or diagnosis for my health issues." (Am. Compl. at 11.) However, the crux of the Amended Complaint is Rivera's contention that he did not receive adequate medical care from May 22, 2023, through May 27, 2023, when his conditions worsened to the point where he suffered a medical emergency that he alleges was a heart attack. Indeed, in his Response, Rivera makes clear that his claims are based on the injuries he sustained on May 27 and that the additional allegations were included to establish that "defendants[] were well aware [he] is a heart patient" and to provide context for the events leading up to that date. (ECF No. 33 at 42, 49; *id.* at 14 (arguing that the Medical Defendants had seen him on "numerous occasions at the medical department," so they were aware of his medical conditions, yet failed to "render aid, knowing [he] was in medical distress suffering a heart attack as well as knowing [he] has a heart condition").) Accordingly, it is apparent that Rivera's claims are timely.

treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted).

A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). Rather, "when medical care is provided, [courts] presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017).  However, inadequate care may give rise to a deliberate indifference claim when a defendant "act[s] with the requisite state of mind when providing that inadequate care." *Id.*

Rivera has alleged sufficient facts to proceed on his deliberate indifference claims. Reading the allegations liberally and taking all reasonable inferences in Rivera's favor, as the Court is required to do at this stage of the litigation, Rivera has alleged that, as an inmate with a history of blood pressure issues, his health condition declined beginning on May 22, 2023.  His symptoms, which included chest pains, got worse over the course of a few days, culminating in a

medical emergency during which he was incoherent and blacked out, and which he describes as a heart attack. "[S]evere chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard." *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005); *see also Maulsby v. Ephrain*, No. 22-4840, 2024 WL 1253689, at *4 (E.D. Pa. Mar. 22, 2024) ("Maulsby, a wheelchair bound man in his mid-sixties, was in distress, complaining of severe chest pains. It would be obvious to a layperson in Ephraim's position that Maulsby needed medical attention, making the medical need a serious one."). The Medical Defendants argue that Rivera "never suffered a heart attack" and that his medical records and laboratory results do not "support a medical finding of a heart attack." (ECF No. 36 at 1.) This, however, is a disagreement about the facts underlying Rivera's claims, and the Court may not credit the Medical Defendants version of events over Rivera's. In any event, even the Medical Defendants acknowledge that, regardless of the ultimate diagnosis, Rivera was "impaired" and experienced a "medical emergency" that necessitated treatment. (ECF No. 21 at 9.) Accordingly, Rivera has adequately pled that he suffered from a serious medical need in May 2023. *See Knepp v. Paraway*, No. 19-00153, 2020 WL 7865401, at *7 (W.D. Pa. Nov. 18, 2020), *report and recommendation adopted,* 2020 WL 7864199 (W.D. Pa. Dec. 31, 2020) ("Although physicians . . . ultimately determined that Knepp's symptoms . . . were attributable to gastritis rather than cardiac related, his complaints of chest pains and other symptoms must be considered to have represented a 'serious' medical need considering his medical history.").

Rivera has also adequately pled sufficient factual matter to support a plausible inference of deliberate indifference. Taken as a whole, the Amended Complaint alleges that from May 22, 2023 until the medical emergency on May 27, 2023, Rivera repeatedly sought medical attention

for his declining situation and specifically discussed his worsening symptoms with all of the named Defendants during this time period.  Taking reasonable inferences in Rivera's favor, despite his medical history and efforts to seek care, the Defendants allegedly brushed him off with half-measures that did not treat his condition with the requisite urgency (Dr. Little), ignored him and did not take him seriously to the point of delaying medical care (Arias), threatened to punish him if he sought additional medical attention (Nicholson), disregarded his symptoms to the point they provided improper treatment (Davis and Hardy), and housed him in the RHU without medical treatment during a medical emergency (Reeder).   In other words, viewing these events in a light most favorable to Rivera, he sought medical attention for what he believed to be — and what ultimately was — an urgent medical situation, but no one handled the situation with the requisite seriousness or urgency despite having been told of his symptoms.  *See, e.g.*, *Pearson v. Prison Health Serv.*, 348 F. App'x 722, 725 (3d Cir. 2009) (*per curiam*) (concluding that prisoner stated a claim where he alleged that he suffered delayed medical care in response to an emergency even though he had been placed on a sick call slip for the next day and where he was denied treatment at the time because he had already been placed on the sick call list); *McKissick v. Cnty. of York*, No. 09-1840, 2011 WL 5117621, at *13 (M.D. Pa. Oct. 25, 2011) (permitting deliberate indifference claims to proceed where "the evidence seems to be uncontroverted that on that day, Troy Cole complained regularly, and with increasing urgency, about experiencing withdrawal symptoms; shortness of breath; and blood pressure readings found by outside experts to be elevated even to the point of being 'astounding'" but medical personnel failed to address his declining condition).

The Defendants arguments for dismissal are based on a narrow reading of the Amended Complaint that views the events in their favor and disregards the context in which Rivera's

factual allegations are made.  The Defendants correctly argue that when medical professionals exercise their professional judgment in treating a prisoner, the prisoner's disagreement with the adequacy of care generally does not amount to a deliberate indifference claim, (ECF No. 21 at 8; ECF No. 41 at 11).  *See, e.g.*, *Davis v. Supt. Somerset SCI,* 597 F. App'x 42, 45 (3d Cir. 2015) (*per curiam*) (explaining that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law'" (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979))); *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) ("[P]rison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners").  But that legal principle does not help them at this stage of the case, when the facts pertaining to the details of what occurred during the relevant six-day period in May, the specific nature of Rivera's condition, and the specifics about who knew what and when are very much disputed.  Discovery can be expected to clarify what occurred over this six-day period.

### F. Retaliation

The DOC Defendants moved to dismiss the retaliation claim against Arias on the basis that it is inadequately pled.  (ECF No. 41 at 14.)  Rivera did not respond to this argument.  To state a plausible First Amendment retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action.  *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  A prisoner's filing of a grievance or expressing an intent to file a grievance constitutes constitutionally protected conduct.  *See Watson v. Rozum*,

834 F.3d 417, 422-23 (3d Cir. 2016); *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000).

"An adverse consequence 'need not be great in order to be actionable[;]' rather, it need only be

'more than *de minimis*.'" *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436 F.3d 165, 170

(3d Cir. 2006)) (alterations in original). "[B]eing placed in lockdown, being moved to restricted

housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." *See*

*Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) (*per curiam*) (quoting *McKee*, 436

F.3d at 170); *see also Mitchell v. Horn*, 318 F.3d 523, 530-31 (3d Cir. 2003) ("Mitchell's

allegation that he was falsely charged with misconduct in retaliation for filing complaints against

Officer Wilson implicates conduct protected by the First Amendment."). The timing of the

allegedly retaliatory behavior relative to the constitutionally protected conduct may establish a

causal link between the two for purposes of establishing motivation. *See Watson*, 834 F.3d at

422.

Rivera appears to be raising a retaliation claim against Arias based on his allegation that

Arias approached him on June 16, 2023 to question him about a grievance in an "intimidating"

manner and "harassed [Rivera] and [tried] to continue to intimidate [him] because of the

grievances" Rivera filed against him. (Am. Compl. at 13; *see also id.* at 6 (listing June 16, 2023

as one of the dates upon which events giving rise to his claims occurred).) These allegations are

far too undeveloped to state a plausible retaliation claim. Although filing grievances is protected

conduct, Rivera does not describe with any specificity what adverse action Rivera allegedly took

against him. Nor does Rivera provide any details about his interactions with Arias during this

time-period from which one could infer that he acted with a retaliatory motive. In other words,

Rivera's allegations that Arias retaliated against him for filing grievances by "intimidating" him,

unsupported by any specific allegations explaining what Arias did or said to Rivera, does not

state a plausible retaliation claim.  *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts

that are merely consistent with a defendant' s liability, it stops short of the line between

possibility and plausibility of 'entitlement to relief."  (internal quotations omitted)); *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their

claims across the line from conceivable to plausible, their complaint must be dismissed."); *see

also Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (*per curiam*) (concluding that

"verbal threats and few gestures of racial harassment" were insufficiently adverse to support a

retaliation claim).

## IV.    CONCLUSION

Rivera may proceed to discovery on his Eighth Amendment claims for deliberate

indifference to his serious medical needs based on the events of May 22, 2023 through May 27,

2023 to the extent he is bringing those claims against the Defendants in their individual

capacities and seeking damages.  Rivera's state law medical malpractice claims for damages

against the Medical Defendants also remain in the case.  The balance of the Amended Complaint

will be dismissed for the reasons discussed above.

Rivera will be given the option of proceeding on his remaining claims at this time or

filing a second amended complaint in the event he seeks to amend any claims the Court has

dismissed, with the exception of Rivera's claims against the DOC Defendants in their official

capacities and the state law claims against the DOC Defendants because amendment of those

claims would be futile.  An order follows, which provides further guidance for proceeding.

BY THE COURT:

*/S/Kai N. Scott*
_____
**KAI N. SCOTT, J.**